UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

M.M. on Behalf of and as Parent
of J.S., a student with a disability,

                    Plaintiffs,              Docket No.
                                       14-CV-1542 (GBD)

          - against -

NEW YORK CITY DEPARTMENT          ECF Case
OF EDUCATION,

                Defendant.
------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

THOMAS GRAY (TG 0880)
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for Plaintiff
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 ext. 246
Fax (212) 683-5544
tgray@pfcr.org

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY AND STATEMENT OF FACTS ................................ 1

LEGAL FRAMEWORK AND STANDARD OF REVIEW .................................. 7

    A. The Purpose and Scope of the IDEA ............................................................ 7

    B. Tuition Claims Under the IDEA .................................................................. 9

    C. IDEA District Court Actions ...................................................................... 10

ARGUMENT ........................................................................................................... 11

POINT I: THE DOE DENIED J.S. A FAPE ......................................................... 11

    A. The DOE Failed to Engage in the IDEA's Mandated Triennial
       Reevaluation Process, Significantly Impeding M.M.'s Parental
       Participation, Significantly Impeding J.S.'s Right to a FAPE,
       and Depriving J.S. of Educational Benefits ............................................... 11

        i. The Triennial Reevaluation Process – The Statutory Framework ....... 11

        ii. The DOE Failed to Engage in the Required Triennial Reevaluation
          Process Prior to the 2012-2013 School Year ................................... 13

        iii. The DOE's Failure to Involve M.M. in a Triennial Reevaluation
          Process Significantly Impeded Her Opportunity to Participate in
          the Decision-Making Process Regarding J.S.'s Education .............. 15

        iv. The DOE's Failure to Reevaluate J.S. Significantly Impeded
          His Right to a FAPE ......................................................................... 18

        v. The DOE's Failure to Reevaluate J.S. Deprived Him of
          Educational Benefits ........................................................................ 19

    B. The Failure of J.S.'s IEP to Indicate the Academic and Vocational
       Nature of the Recommended Program Significantly Impeded M.M.'s
       Ability to Participate in the Decision-Making Process Regarding J.S.'s
       Education and Deprived J.S. of an Appropriate IEP .................................. 22

    C. The 12:1:1 Program Recommendation Deprived J.S. of Educational
       Benefits ...................................................................................................... 27

D.  The SRO's Preclusion of M.M.'s Allegation that McSweeney
    Could Not Have Provided J.S. with a FAPE is Wrong          27

POINT II:       COOKE WAS AN APPROPRIATE PLACEMENT FOR J.S.          31

POINT III:      THE EQUITIES FAVOR TUITION PAYMENT          33

POINT IV:       DIRECT PAYMENT OF TUITION IS APPROPRIATE          34

CONCLUSION          35

# TABLE OF AUTHORITIES

## CASES

*Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877 (9th Cir. 2001)                    17

*Bell v. Bd. of Educ.*, 2008 WL 5991062 (D.N.M. Nov. 28, 2008)                    18, 19

*Board of Educ. v. Rowley*, 458 U.S. 176 (1982)                    8, 32

*B.R. v. New York City Dep't of Educ.*, 910 F.Supp.2d 670 (S.D.N.Y. 2012)                    30

*Burlington v. Dep't of Educ.*, 736 F.2d 773 (1st Cir. 1984)                    34

*Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985)                    5, 9, 10, 31, 33

*C.F. v. New York City Dep't of Educ.*, 2011 WL 5130101 (S.D.N.Y. Oct. 28, 2011)                    10

*C.L. v. Scarsdale Union Free Sch. Dist.*, 2012 WL 983371 (S.D.N.Y. Mar. 22, 2012)                    11

*C.U. v. N.Y.C. Dep't of Educ.*, 2014 WL 2207997 (S.D.N.Y. May 27, 2014)                    9, 17, 29, 30

*D.C. v. New York City Dep't of Educ.*, 2013 WL 1234864 (S.D.N.Y. Mar. 26, 2013)                    30

*D.S. v. N.Y.C. Dep't of Educ.*, 2014 WL 2600313 (E.D.N.Y. June 10, 2014)                    24, 25, 30

*E.A.M. v. New York City Dep't of Educ.* 2012 WL 4571794 (S.D.N.Y. Sept. 29, 2012)                    30

*E.M . v. New York City Dep't of Educ.*, 2014 WL 3377162 (2d Cir. July 11, 2014)                    9, 34

*Florence County School District Four v. Carter*, 510 U.S. 12 (1993)                    9, 31

*Frank G. v. Bd. of Educ.*, 459 F.3d 356 (2d Cir. 2006)                    31, 32

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105 (2d Cir. 2007)                    11, 15, 31

*Grim v. Rhinebeck Central School Dist.*, 346 F.3d 377 (2d Cir. 2003)                    12

*J.F. v. New York City Dep't of Educ.*, 2013 WL 1803983 (S.D.N.Y. Apr. 24, 2013)                    30

*J.F. v. New York City Dep't of Educ.*, 2012 WL 5984915 (S.D.N.Y. Nov. 27, 2012)                    30

*Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77 (2d Cir. 2005)                    15

*M.H. v. New York City Dep't of Educ.*, 712 F.Supp.2d 125 (S.D.N.Y. 2010)                    25

*M.H. v. New York City Dep't of Educ.*, 685 F.3d 217 (2d Cir. 2012)                    11, 15, 25

*M.M. v. New York City Dep't of Educ.*, 2014 WL 2757042 (S.D.N.Y. June 27, 2014)                    34

*M.P.G. v. New York City Dep't of Educ.*, 2010 WL 3398256 (S.D.N.Y. Aug. 27, 2010)                    28

*Mr. and Mrs. A v. N.Y.C. Dep't of Educ.*, 769 F.Supp.2d 403 (S.D.N.Y. 2011)                    10, 34, 35

*N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202 (9th Cir. 2008)                    19

*N.R. v. New York City Dep't of Educ.*, 2009 WL 874061 (S.D.N.Y. Mar. 31, 2009)                    34

*R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012)                    15, 19, 22, 26, 29

*Reyes v. New York City Dep't of Educ.*, 2014 WL 3685943 (2d Cir. July 25, 2014)                    21, 29

*Schaffer v. Weast*, 546 U.S. 49 (2005)                    8

*Scott v. New York City Dep't of Educ.*, 2014 WL 1225529 (S.D.N.Y. Mar. 25, 2014)                    30

*T.K. v. New York City Dep't of Educ.*, 2014 WL 3687244 (E.D.N.Y. July 23, 2014)                    22

*T.L. v. New York City Dep't of Educ.*, 2013 WL 1497306 (E.D.N.Y. Apr. 12, 2013)                    30,31

*T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247 (2d Cir. 2009)                    11

*T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412 (2d Cir. 2009)                    9, 29. 30

*Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119 (2d Cir. 1998)                    8, 31

*Winkelman ex rel. Winkelman v. Parma City School Dist.*, 550 U.S. 516 (2007)                    17

*Wolfe v. Taconic-Hills Cent. School Dist.*, 167 F.Supp.2d 530 (N.D.N.Y. 2001)                    34

## STATUTES

20 U.S.C. § 1400(d)(1)(A)                    8

| | |
|---|---|
| 20 U.S.C. § 1400(d)(1)(B) | 8, 16 |
| 20 U.S.C. § 1401(9) | 8 |
| 20 U.S.C. § 1414(a)(2)(A) | 16 |
| 20 U.S.C. § 1414(a)(2)(B)(ii) | 8,11, 13, 16 |
| 20 U.S.C. § 1414(b)(1) | 12, 16 |
| 20 U.S.C. § 1414(b)(2)(A) | 8 ,12 |
| 20 U.S.C. § 1414(c)(1) | 13 |
| 20 U.S.C. § 1414(c)(1)(A)(i) | 12, 16 |
| 20 U.S.C. § 1414(c)(1)(B) | 12, 16 |
| 20 U.S.C. § 1414(c)(4)(A) | 12 |
| 20 U.S.C. § 1414(c)(4)(A)(i) | 16 |
| 20 U.S.C. § 1414(c)(4)(A)(ii) | 16 |
| 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) | 24 |
| 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) | 19, 20 |
| 20 U.S.C. § 1414(d)(2)(A) | 14, 28 |
| 20 U.S.C. § 1415(a) | 17 |
| 20 U.S.C. § 1415(f)(3)(E)(ii)(II) | 13, 22 |
| 20 U.S.C. § 1415(i)(2)(A) | 1 |
| | |
| N.Y. Educ. L. § 4404(1)(c) | 10, 21 |

## REGULATIONS

| | |
|---|---|
| 8 N.Y.C.R.R. § 200.4(b)(4) | 11, 13, 16 |
| 8 N.Y.C.R.R. § 200.4(b)(6)(viii) | 20 |
| 8 N.Y.C.R.R. § 200.5(k) | 10 |
| | |
| 34 C.F.R. § 300.304(c)(4) | 12, 13 |
| 34 C.F.R. § 300.304(c)(6) | 12, 13 |
| 34 C.F.R. § 300.305(a)(2) | 18 |
| 34 C.F.R. § 300.305(d)(1) | 13 |
| 34 C.F.R. § 300.320(b) | 24 |
| 34 C.F.R. § 300.503 | 23 |
| 34 C.F.R. § 300.503(a)(1) | 22 |
| 34 C.F.R. § 300.507 | 10 |
| 34 C.F.R. § 300.508 | 10 |
| 34 C.F.R. § 300.509 | 10 |
| 34 C.F.R. § 300.510 | 10 |
| 34 C.F.R. § 300.511 | 10 |
| 34 C.F.R. § 300.512 | 10 |
| 34 C.F.R. § 300.513 | 10 |
| 34 C.F.R. § 300.514(b) | 10 |
| 34 C.F.R. § 300.516 | 10 |
| 34 C.F.R. § 300.516(a) | 10 |
| | |
| 71 Fed. Reg. 45640, 46641 (Aug. 14, 2006) | 14 |

**MISCELLANEOUS**

Letter from Musgrove to Spitzer-Resnick et al.
www2.ed.gov/policy/speced/guid/idea/memosdcltrs/062212workplacelre2q2012.pdf)    23

Memorandum Cort to District Superintendents (Nov. 2011)
www.p12.nysed.gov/specialed/publications/transitionplanning-nov11.pdf    24

S. Rep. No. 108-185, at 41 (2003)    18, 19

## PRELIMINARY STATEMENT

Plaintiff M.M. commenced this action pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1415(i)(2)(A), on behalf of and as parent and guardian of J.S. to seek reversal of a final administrative decision rendered by the New York State Review Officer ("SRO") finding that Defendant New York City Department of Education ("DOE") offered J.S. a free appropriate public education ("FAPE") for the 2012–2013 school year and denying M.M.'s request for an order directing the DOE to pay J.S.'s tuition at the Cooke Center for Learning and Development ("Cooke") for that school year.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

J.S. was born in February 1994 and was 18 years old at the start of the 2012-2013 school year (Exhibit ("Exh.") 3 at 1). He began attending Cooke for the 2008-2009 school year, when he was age 14 (Exh. X ¶ 3).[1]

Prior to May 2012 the DOE had, from his early childhood, classified J.S. as a student with a Speech or Language Impairment; in May 2012 the DOE reclassified J.S. as a student with Autism (Exh. 3 at 1; Exh. 5 at 1; Exh. 12 at 5).

M.M. had J.S. evaluated at a private institution, the Kennedy Child Study Center ("Kennedy Center"), on March 19 and June 2, 2009 (Exh. 5). Following testing conducted on those dates, the Kennedy Center produced a Comprehensive Psychoeducational Evaluation ("2009 Psychoeducational Evaluation").

---

[1] Exh. X is the "official" English translation of M.M.'s affidavit. The Impartial Hearing Officer neglected to include this exhibit in the hearing record after it was entered into evidence on June 6, 2013 (*see* July 18, 2013 Findings of Fact and Decision ("FFD") at 12-13; Dec. 20, 2013 FFD at 10-11; Hearing Transcript ("Tr.") 272-73). M.M. re-submitted the affidavit to the SRO as an attachment to her August 19, 2013 Verified Petition as "Appeal Exhibit 4." It is referred to herein as "Exh. X," which is what the document was marked when it was originally submitted into the record at the impartial hearing (*see* Tr. 272-73).

In or about the late summer of 2011, M.M. requested that Cooke conduct intellectual testing of J.S. (Hearing Transcript ("Tr.") 240-41). M.M. made this request to support a disability benefits application she had filed on behalf of J.S. and to support her effort to obtain a guardianship order (Tr. 241). Cooke produced a Stanford-Binet Intelligence Scales, Fifth Edition, Narrative Report ("Stanford-Binet Report"), dated January 5, 2012 (Exh. 15). M.M. did not obtain a copy of the Stanford-Binet Report until February or March 2013 (Tr. 238).

**The May 22, 2012 Committee on Special Education Meeting and Individualized Education Program**

The DOE convened a Committee on Special Education ("CSE") meeting on May 22, 2012 to prepare J.S.'s Individualized Education Program ("IEP") for the 2012–2013 school year (Exh. 3). DOE had not evaluated J.S. in the three years prior to the May 2012 CSE meeting, and only possessed the following documents at the meeting: the 2009 Psychoeducational Evaluation and reports from Cooke (Exh. 22 ¶¶ 13, 16).

The DOE prepared a May 22, 2012 IEP that recommended that J.S. be placed in a 12:1:1 program in a specialized "District 75" public school for a 12-month school year (Exh. 3 at 9, 12-13). The IEP indicated that J.S. would participate in a "work study program," but did not specify the duration of the program, the nature of the work assignment, or whether the location of the work assignment would be in a school or elsewhere (Exh. 3 at 10-11). The IEP did not indicate whether the referenced work program would be J.S.'s primary educational program or whether J.S. would be in a program that emphasized academics (*see* Exh. 3; Tr. 11, 13-14).

The IEP did not offer any specific description of J.S.'s vocational interests or relevant skills, as the "Functional Vocational Assessment" box in the IEP's "Coordinated Set of Transitional Activities" section was left blank (Exh. 3 at 11). The IEP did not designate the party

or parties responsible for providing J.S. with services to assist him in transitioning to post-school life during the 2012-2013 school year (Exh. 3).

The IEP's report of J.S.'s academic functional levels were drawn from informal assessments conducted at Cooke (Exh. 3 at 1, 12; Exh. 22 ¶¶ 20-22). The IEP offered no assessment or description of J.S.'s level of cognitive functioning (Exh. 3). The IEP offered no specific assessment of J.S.'s social or emotional functioning (Exh. 3 at 2).

The IEP's goals included activities that had to be conducted in a community setting, such as participating "in [a] community leisure activity" and demonstrating accurate money handling in a community setting (Exh. 3 at 3, 8).

At the CSE meeting, Sally Ord, a consulting teacher at Cooke, objected to the IEP's 12:1:1 program recommendation, indicating that it would not provide J.S. with as small and supportive a learning environment as he required (Exh. M ¶¶ 18-19; Exh. 11 at 4; Exh. 12 at 4). M.M. did not agree with the IEP's program, because the program did not appear to allow J.S. to make academic progress, which was her primary concern as "academic progress will help J.S. be better able to find a job and be independent" (Exh. X ¶ 8; *see* Exh. 12 at 4).

**The DOE's Recommended Placement – the Stephen D. McSweeney School**

By a June 15, 2012 notice, the DOE recommended P.S. 721X, the Stephen D. McSweeney School ("McSweeney") as J.S.'s school placement for the 2012-2013 school year (Exh. 17).

M.M. and Cooke educator Dr. Francis Tabone visited McSweeney on June 20, 2012; they were informed that due to J.S.'s age, he would spend the entire school day at a worksite and receive only brief academic instruction (Exh. N ¶ 9; Exh. X ¶¶ 10-11).

On June 21, 2012 and August 22, 2012, counsel for M.M. wrote to the DOE objecting to the DOE's May 22, 2012 IEP and recommended placement at McSweeney as inappropriate to address J.S.'s needs (Exhs. B, C). The DOE did not respond to either letter (Exh. 1 at 4).

**J.S.'s Enrollment and Educational Program at Cooke**

M.M. reenrolled J.S. in Cooke for the 12-month 2012-2013 school year, signing enrollment contracts with Cooke on June 25, 2012 for both the academic and summer terms (Exhs. D, E). The contracts allowed M.M. to withdraw J.S. from Cooke without financial penalty if the DOE offered J.S. an appropriate placement by July 30, 2012 for the summer term, and by October 31, 2012 for the academic term (Exh. D ¶ 7.b 2; Exh. E ¶ 10.b).

The contracts provided that J.S.'s tuition at Cooke was $7,275.00 for the summer term and $48,500.00 for the academic term (Exh., D ¶ 2.a; Exh. E ¶ 2.a).

J.S. attended Cooke's summer program from July 2 to August 8, 2012 (Exh. K ¶ 10). Cooke's summer program was designed to help J.S. maintain skills he had learned during the previous academic term (Exh. K ¶ 7).

During the September 2012 to June 2013 academic term at Cooke, J.S. was one of five students in his math and literacy classes (Exh. I ¶¶ 8-9). He participated in an internship, had individual and group counseling, speech and language therapy, occupational therapy, as well as a current events class and a vocational skills class (Exh. 19). He received extensive instruction in community settings, including approximately three school trips into the community each week (Exh. J ¶ 19).

During the 2012–2013 school year, J.S. made progress in literacy and math, and he improved his ability to function in the community, his ability to travel, and his job skills (Exh. I ¶¶ 15, 19-20; Exh. J ¶¶ 25-27; Exh. 19).

**The Impartial Hearing**

M.M., through counsel, filed a due process complaint on March 18, 2013 (Exh. 1). The complaint alleged that the DOE denied J.S. a FAPE for the 2012-2013 school year because the DOE failed to conduct a triennial reevaluation of J.S., failed to prepare an appropriate IEP, and failed to offer an appropriate school placement (Exh. 1 at 2-3). The complaint requested an order directing the DOE to issue direct payment for J.S.'s $55,775.00 tuition at Cooke for the 12-month school year, as M.M. lacked the financial means to pay the tuition in advance and seek reimbursement (Exh. 1 at 5).

The case was assigned to Impartial Hearing Officer ("IHO") Mary Noe, who presided at an impartial hearing on May 16, June 6, and June 19, 2013 (Tr. 1-295).

The DOE presented two witnesses: Evelyn Alvarez, a special education teacher assigned to CSE Region 9; and Susan Naclerio, the IEP/Related Services Coordinator at McSweeney (Exhs. 21-22; Tr. 6-16, 54-109).

M.M. presented five witnesses in addition to herself: Katherine Hibbard, the Head Teacher of Literacy and Mathematics at Cooke; Victoria Fowler, a counselor and administrative coordinator at Cooke; Mary Clancy, the Director of the Cooke Summer Academy; Ms. Ord; and Dr. Tabone (Exhs. I, J, K, L, M, N, X; Tr. 17-48, 115-241).

**The First IHO Decision and the First Administrative Appeal**

On July 18, 2013, IHO Noe issued a Findings of Fact and Decision ("FFD") that denied M.M.'s request for tuition payment, but which failed to evaluate M.M.'s tuition claim under the three prong test established in *School Committee of Burlington v. Department of Education*, 471 U.S. 359 (1985) (*see* July 18, 2013 FFD).

By an August 19, 2013 Verified Petition, M.M. initiated an appeal of IHO Noe's July 18, 2013 FFD to the SRO, seeking either reversal of the decision or remand to a different IHO for a new decision that correctly applied the three-prong *Burlington* adjudicatory procedure. On September 17, 2013, the DOE submitted a Verified Answer and Cross-Appeal. M.M. submitted a Verified Reply and Answer to Cross-Appeal on October 4, 2013.

In decision number 13-157, dated November 8, 2013, SRO Justyn P. Bates ordered the case remanded to IHO Noe, or to a different IHO if IHO Noe was unavailable, to conduct additional administrative proceedings, if necessary, and to issue a new decision applying the three-prong *Burlington* adjudicatory scheme (SRO Decision ("Dec.") No. 13-157). In a footnote, the SRO wrote: "As the student did not attend the assigned public school site, the IHO's determination regarding whether the district offered the student a FAPE for the 2012-13 school year is limited to" M.M.'s allegations concerning the DOE's failure to conduct a triennial reevaluation, and her allegations regarding the IEP's recommended program (*Id.* at n.12).

On March 6, 2014, M.M. filed a district court complaint appealing the SRO's dismissal of M.M.'s claims regarding J.S.'s placement at McSweeney.

**The Second IHO Decision and the Second Administrative Appeal**

On December 20, 2013, IHO Noe issued a new decision determining that the DOE had offered J.S. a FAPE for the 2012-2013 school year and denying M.M.'s tuition claim (Dec. 20, 2013 FFD). The IHO did not determine if Cooke's program was appropriate for J.S. or whether the equities favored M.M.'s tuition claim (*see id.*).

M.M. appealed IHO Noe's December 20, 2013 decision to the SRO by a January 23, 2014 Verified Petition. The DOE responded in a Verified Answer, dated February 7, 2014. M.M. submitted a Verified Reply on February 12, 2014.

In decision number 14-018, dated March 18, 2013, the SRO dismissed M.M.'s appeal and upheld IHO Noe's decision (SRO Dec. No. 14-018). The SRO found that at the time of the May 22, 2012 CSE meeting J.S.'s "most recent June 2009 evaluation remained timely and the district was not obligated to proceed with a triennial reevaluation" (SRO Dec. No. 14-018 at 9).

The SRO also found that the DOE's failure to conduct a vocational assessment did not result in a failure to offer J.S. a FAPE (SRO Dec. No. 14-018 at 12-13).The SRO reasoned that the IEP's failure to state the amount of academic instruction versus vocational instruction J.S. would receive was not an error because M.M. "would learn that information from the public school" and McSweeney's IEP coordinator Ms. Naclerio testified that the school "could implement both the academic and vocational components" of the IEP (SRO Dec. No. 14-018 at 15). With regard to the 12:1:1 program that the DOE offered to J.S., the SRO determined that the record did "not contain sufficient evidence upon which to conclude that the recommendation was not appropriate to meet [J.S.'s] needs" (SRO Dec. No. 14-018 at 15).

Finally, the SRO found that M.M.'s claims regarding McSweeney speculative and not "an appropriate inquiry under the circumstances of this case" (SRO Dec. No. 14-018 at 19-22).

The SRO did not determine if Cooke was an appropriate placement for J.S. or whether equitable considerations supported M.M.'s claim for tuition funding (SRO Dec. No. 14-018).

On May 14, 2014, M.M. filed an amended complaint, appealing the final administrative determinations in SRO decision number 13-157 and SRO decision number 14-018.

## LEGAL FRAMEWORK AND STANDARD OF REVIEW

### A.  The Purpose and Scope of the IDEA

The purpose of the IDEA is to ensure that all children with disabilities are provided with a "free appropriate public education that emphasizes special education and related services

designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *Schaffer v. Weast*, 546 U.S. 49, 51 (2005). The IDEA seeks to ensure "that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B).

To satisfy the IDEA's requirements, a school district must provide each disabled child with "special education and related services," § 1401(9), that are "reasonably calculated to enable the child to receive educational benefits," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982), and "tailored to meet the unique needs of a particular child," *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998).

After a child has been initially evaluated and determined to be a child with a disability, school districts are required to conduct a reevaluation "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(ii). Evaluations must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent." 20 U.S.C. § 1414(b)(2)(A).

In order to comply with the IDEA's mandate that every disabled child is provided a FAPE, a school district must comply with the IDEA's procedural requirements and develop an IEP that is reasonably calculated to enable the child to receive educational benefits. *See Rowley*, 458 U.S. at 205-06 ("[i]t seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process … as it did upon the measurement of the resulting IEP against a substantive standard").

8

The district is also required to provide a placement school capable of implementing the IEP. *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009) (districts do not have "carte blanche to assign a child to a school that cannot satisfy the IEP's requirements"); *see also C.U. v. New York City Dep't of Educ.*, No. 13-CV-5209(DLC), 2014 WL 2207997, at *14 (S.D.N.Y. May 27, 2014) ("inasmuch as the Supreme Court has explained that the procedural protections in the IDEA are broad and intended to ensure that parents have an opportunity to give meaningful input on all substantive issues, the Parents had at least a procedural right to inquire whether the proposed school location had the resources set forth in the IEP").

## B.  Tuition Claims Under the IDEA

Under the standard set forth by the United States Supreme Court in *School Committee of Burlington v. Department of Education*, 471 U.S. 359 (1985), and *Florence County School District Four v. Carter*, 510 U.S. 12 (1993), a school district may be required to pay for educational services obtained by a parent for her child if: 1) the services offered by the district were inadequate or inappropriate ("Prong I"); 2) the services obtained by the parent were appropriate ("Prong II"); and 3) equitable considerations support the parent's claim ("Prong III"). *Burlington*, 471 U.S. at 369, 374; *Carter*, 510 U.S. at 12, 16. When the three *Burlington* prongs are satisfied, parents who have unilaterally placed their child in a private school may obtain payment for the tuition. *Id*.

Furthermore, payment of the tuition directly to the private school is appropriate where a school is willing to admit the child of a low-income parent while the parent pursues her due process remedies under the IDEA. *See E.M. v. New York City Dep't of Educ.*, No. 11-CV-1427, 2014 WL 3377162, at *8 (2d Cir. July 11, 2014) ("[i]ndeed, where the equities call for it, direct payment fits comfortably within the *Burlington–Carter* framework: like reimbursement, direct

payment to the private school that provided the required educational program 'merely requires [the school district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP'") (quoting *Burlington*, 471 U.S. at 370–71); *see also Mr. and Mrs. A v. New York City Dep't of Educ.*, 769 F.Supp.2d 403, 428 (S.D.N.Y. 2011) (payment of tuition directly to the private school is an appropriate remedy where the parent satisfies all three *Burlington* prongs, the "parents lack the financial resources to 'front' the costs of private school tuition, and ... a private school is willing to enroll the student and take the risk that the parents will not be able to pay tuition costs").

Parents seeking payment for the cost of a unilateral private school placement must first litigate their claim in an impartial due process hearing. *See* 34 C.F.R. §§ 300.507–13, 516(a). New York State law places the burden of proof at impartial hearings on school districts with respect to all issues other than the appropriateness of a unilateral private school placement selected by the parents. N.Y. Educ. L. § 4404(1)(c) (McKinney 2012); *C.F. v. New York City Dep't of Educ.*, No. 11-CV-00157(LTS), 2011 WL 5130101, at *7 (S.D.N.Y. Oct. 28, 2011).

In two-tiered states such as New York, in which hearings are conducted at the school district level, the hearing decisions are subject to State-level appeals; in New York such appeals are conducted by the SRO. 34 C.F.R. § 300.514(b); 8 N.Y.C.R.R. § 200.5(k). Once these administrative remedies have been exhausted, either the parent or the school district may seek independent judicial review in the state or federal courts. 34 C.F.R. § 300.516.

### C.  IDEA District Court Actions

"Motions for summary judgment customarily resolve IDEA actions in federal court. Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion. Rather, summary judgment 'is a pragmatic procedural mechanism for reviewing

administrative decisions.'" *C.L. v. Scarsdale Union Free Sch. Dist.*, No. 10-CV-4315(CS), 2012

WL 983371, at *7 (S.D.N.Y. Mar. 22, 2012) (internal citations omitted) (quoting *T.P. v.*

*Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009)).

"[T]he district court must engage in an independent review of the administrative record

and make a determination based on a 'preponderance of the evidence,'" giving "due weight" to

the administrative proceedings. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-13

(2d Cir. 2007) (internal citations omitted). The "SRO's or IHO's factual findings must be

'reasoned and supported by the record' to warrant deference." *M.H. v. New York City Dep't of*

*Educ.*, 685 F.3d 217, 241 (2d Cir. 2012) (quoting *Gagliardo*, 489 F.3d at 114).

## ARGUMENT

## POINT I: THE DOE DENIED J.S. A FAPE

**A. The DOE Failed to Engage in the IDEA's Mandated Triennial Reevaluation Process, Significantly Impeding M.M.'s Parental Participation, Significantly Impeding J.S.'s Right to a FAPE, and Depriving J.S. of Educational Benefits**

**i.     The Triennial Reevaluation Process – The Statutory Framework**

After a child is initially evaluated and determined to be disabled a school district must

engage in a reevaluation process "at least once every three years, unless the parent and the local

educational agency agree otherwise." 20 U.S.C. § 1414(a)(2)(B)(ii); *see also* 8 N.Y.C.R.R. §

200.4(b)(4) ("A [CSE] shall arrange for an appropriate reevaluation … at least once every three

years, except where the school district and the parent agree in writing that such reevaluation is

unnecessary").

A triennial reevaluation is not simply a single assessment or test. Rather, reevaluation is a

process that must be "sufficiently comprehensive to identify all of the child's special education

and related services needs, whether or not commonly linked to the disability category in which

the child has been classified." 34 C.F.R. § 300.304(c)(6). To this end, the school district charged

with formulating a child's educational program must gather all "relevant functional,

developmental, and academic information" to fully understand the child's disability and special

education needs. 20 U.S.C. § 1414(b)(2)(A). This requires the school district to assess the child

"in all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4).

A school district is required to engage with a child's parents throughout the reevaluation

process. For instance, districts are required to provide notice to parents prior to conducting any

evaluation procedures. *See* 20 U.S.C. § 1414(b)(1) ("[t]he local educational agency shall provide

notice to the parents of a child with a disability … that describes any evaluation procedures such

agency proposes to conduct"). Moreover, as part of a reevaluation, the IEP team must "review

existing evaluative data on the child, including … evaluations and information provided by the

parents of the child." 20 U.S.C. § 1414(c)(1)(A)(i). Only after reviewing the existing data "and

input from the child's parents," may a school district identify what additional data, if any, are

needed to determine whether the child continues to have a disability and the educational needs of

the child. 20 U.S.C. § 1414(c)(1)(B). Finally, if the school district decides that no additional data

is needed "to determine the child's educational needs," the district "must notify the child's

parents of - (i) that determination and the reasons for the determination; and (ii) the right of the

parents to request an assessment to determine whether the child continues to be a child with a

disability, and to determine the child's educational needs." 20 U.S.C. § 1414(c)(4)(A).

Not "every procedural error in the development of an IEP renders that IEP legally

inadequate under the IDEA." *Grim v. Rhinebeck Central School Dist.*, 346 F.3d 377, 381 (2d Cir.

2003). However, a procedural violation results in a denial of a FAPE when the violation

"impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to

participate in the decisionmaking process," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

In this case, as demonstrated below, the DOE's failure to engage in the triennial reevaluation process, first, significantly impeded M.M.'s opportunity to participate in the decision-making process about J.S.'s education; second, significantly impeded J.S.'s right to a FAPE; and third, deprived J.S. of educational benefits.

### ii.     The DOE Failed to Engage in the Required Triennial Reevaluation Process Prior to the 2012-2013 School Year

The SRO determined that the DOE "was not obligated to conduct a triennial reevaluation of [J.S.] prior to the May 22, 2012 CSE meeting" and that the DOE had until "on or about June 2, 2012" to conduct a reevaluation of J.S. because the 2009 Psychoeducational Evaluation is dated three years prior, June 2, 2009 (SRO Dec. No. 14-018 at 10). The SRO is wrong.

Initially, SRO Bates' finding that the 2009 Psychoeducational Evaluation "remained timely" demonstrates his profound misunderstanding of the IDEA's triennial reevaluation requirements. As outlined above, a triennial reevaluation is not simply a single test or assessment. Rather a triennial reevaluation is a process that a school district engages in with a child's parent to identify all of a child's special education needs, 20 U.S.C. § 1414(a)(2)(B)(ii); 8 N.Y.C.R.R. § 200.4(b)(4), and which is sufficiently comprehensive to assess the child in all areas related to the suspected disability, 34 C.F.R. §§ 300.304(c)(4), 300.304(c)(6). A school district is required to seek input from a child's parents in determining whether additional data is needed as part of a reevaluation, 20 U.S.C. § 1414(c)(1), and to notify the parent of the reasons behind any determination not to seek additional data and the parent's right to nevertheless request an assessment of the child, 34 C.F.R. §§ 300.305(d)(1)(i)-(ii).

Furthermore, the SRO's finding is based on the false assumption that the 2009 Psychoeducational Evaluation is reflective of a triennial reevaluation conducted by the DOE. In fact, there is no evidence in the record of a triennial reevaluation conducted by the DOE in the spring of 2009. M.M. privately obtained the 2009 Psychoeducational Evaluation from the Kennedy Center. As noted by the U.S. Department of Education in its comments accompanying the IDEA regulations, an independent educational evaluation obtained by a parent "would be considered as a potential source of additional information that the public agency and parent could consider in determining whether the educational or related services needs of the child warrant a reevaluation" but "would not be considered a reevaluation" in itself. 71 Fed. Reg. 45640, 46641 (Aug. 14, 2006). Indeed, CSE representative Ms. Alvarez testified that she did not know when the DOE last conducted a triennial "review" for J.S. (Tr. 83-84). There is no evidence that the DOE conducted a triennial reevaluation of J.S. that "remained timely" on May 22, 2012.

In any event, the SRO erroneously focused only on the date of the CSE meeting in assessing whether a triennial reevaluation was required. The relevant date is not the particular date that the CSE scheduled a meeting, but the start of J.S.'s 2012-2013 school year. The IDEA required the DOE to prepare an IEP to guide J.S.'s education during his 2012-2013 school year. *See* 20 U.S.C. § 1414(d)(2)(A) ("[a]t the beginning of each school year, each local educational agency . . . shall have in effect, for each child with a disability in the agency's jurisdiction, an [IEP]"). Indeed, the CSE did not meet on May 22, 2012 to formulate J.S.'s education program for May and June 2012. The CSE met to formulate an educational program for J.S.'s 2012-2013 school year, which started on July 2, 2012 (Exh. 3 at 1). There is no question that three school years had ensued since the 2009 Psychoeducational Evaluation was issued on June 2, 2009: 2009-2010, 2010-2011, and 2011-2012. The SRO improperly and illogically excused the DOE

14

from its triennial reevaluation obligation because the private evaluation obtained by M.M.

predated the CSE meeting by ten days less than three years.

Moreover, even assuming that the DOE had conducted a triennial reevaluation process on

June 2, 2009, under the SRO's logic the DOE would still have had to complete a triennial

reevaluation of J.S. by June 3, 2012. The DOE did not do so, and thus was out of compliance

with the IDEA's triennial reevaluation requirement at the start of J.S.'s 2012-2013 school year

on July 2, 2012.

The SRO compounded an errant factual finding with faulty logic to determine that the

DOE did not violate the IDEA's triennial reevaluation requirement in this case. This erroneous,

unreasoned, and unsupported legal determination is entitled to no deference from this Court. *See*

*M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012) ("[t]he SRO's or IHO's

factual findings must be 'reasoned and supported by the record' to warrant deference") (quoting

*Gagliardo*, 489 F.3d at 114); *see also R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189

(2d Cir. 2012) ("the deference owed to an SRO's decision depends on the quality of that

opinion," including whether the opinion is "'well-reasoned.'" (quoting *M.H.*, 685 F.3d at 244));

*id*. at 194 ("[b]ecause the SRO's conclusion was against the weight of the evidence and thus

flawed, deference to it is not warranted."); *Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d

Cir. 2005) (explaining that the "'due weight' we ordinarily must give to the state administrative

proceedings is not implicated with respect to issues of law") (internal citations omitted).

### iii.     The DOE's Failure to Involve M.M. in a Triennial Reevaluation Significantly Impeded Her Opportunity to Participate in the Decision-Making Process Regarding J.S.'s Education

The DOE's failure to engage in a triennial reevaluation significantly impeded M.M.'s

opportunity to participate in the decision-making process regarding J.S.'s education and violated

a primary purpose of the IDEA "to ensure that the rights of children with disabilities and *parents of such children* are protected." 20 U.S.C. § 1400(d)(1)(B) (emphasis added).

The DOE failed to present any evidence that:

1) It notified M.M. that J.S. was due for a triennial reevaluation, *see* 20 U.S.C. § 1414(b)(1);

2) A multidisciplinary team reviewed the available information and data on J.S., *see* 20 U.S.C. § 1414(c)(1)(A)(i);

3) It contacted M.M. to seek her input in deciding whether additional data was required, *see* 20 U.S.C. § 1414(c)(1)(B);

4) It notified M.M. of any determination that no additional data was needed, *see* 20 U.S.C. § 1414(c)(4)(A)(i);

5) It notified M.M. of her right to request an assessment to determine J.S.'s educational needs, *see* 20 U.S.C. § 1414(c)(4)(A)(ii); or

6) It agreed with M.M. that a reevaluation was not necessary, *see* 20 U.S.C. § 1414(a)(2)(B)(ii), 8 N.Y.C.R.R. § 200.4(b)(4).

Moreover, the only evidence that the DOE presented with regard to its triennial reevaluation obligations under the IDEA was incorrect and reflects an indifference to understanding the nature of J.S.'s impairments. CSE representative Ms. Alvarez, the only DOE witness who addressed M.M.'s allegation that a reevaluation was required, attempted to justify the fact that the DOE did not conduct a triennial reevaluation by stating that M.M. "did not request a new psycho-educational evaluation at the time of the [CSE] meeting" (Exh. 22 ¶ 18). And additionally, in apparent reference to the witnesses from Cooke, that "[n]one of the other meeting participants requested a new psycho-educational evaluation at the time of the meeting" (Exh. 22 ¶ 18). However, as demonstrated above, it is not the parent's burden to request a reevaluation. Nor was it the obligation of any representatives from Cooke. Rather, the IDEA is clear that it is the "local educational agency" that "shall ensure that a reevaluation of each child with a disability is conducted …" 20 U.S.C. § 1414(a)(2)(A). Indeed, at the May 16, 2013

16

impartial hearing date, Ms. Alvarez admitted that when the DOE engages in the triennial reevaluation process, the process entails, 1) the DOE "consulting the parent about whether evaluations or assessments need to be conducted," and 2) the DOE sending the parent a letter prior to a CSE meeting (Tr. 83).

In short, the DOE failed to contact, notify, or engage M.M. in any of the ways the IDEA requires of school districts during a triennial reevaluation process. Furthermore, the SRO erred in failing to address M.M.'s assertion that the DOE's failure to engage in the triennial reevaluation process significantly impeded her opportunity to participate in the decision-making process regarding J.S.'s education (*see* SRO Dec. No. 14-018 at 9-14; *see* Jan. 23, 2014 Verified Petition ¶¶ 31-32).

"Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA. An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed." *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001) (internal citations omitted). Indeed, as this Court has recognized, "the IDEA 'sets up general procedural safeguards that protect the informed involvement of parents in the development of an education for their child' ... Chief among these is the requirement that states and localities receiving federal funding 'establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agencies.'" *C.U.,* 2014 WL 2207997, at *12 (quoting *Winkelman ex rel. Winkelman v. Parma City School Dist.*, 550 U.S. 516, 524 (2007) and 20 U.S.C. § 1415(a)). In this case, the DOE completely left M.M. out of the process of developing information to use to formulate J.S.'s IEP.

Moreover, the DOE's failure to engage M.M. in the triennial reevaluation process deprived her of adequate information about J.S.'s condition and impaired her ability to advocate for J.S.'s educational needs. *See Bell v. Bd. of Educ.*, No. 06-CV-1137(JB/ACT), 2008 WL 5991062, at *31 (D.N.M. Nov. 28, 2008) (where parents lack "reliable information on which to rely in advocating for [the child] … [s]uch an impediment to the full participation of [the child's] parents in the IEP process amounts to a denial of a FAPE"); *see also* S. Rep. No. 108-185, at 41 (2003) (a Senate report noting that "there are procedural violations which can deny a child a [FAPE]. For example, a school's failure to give a parent access to initial evaluation information to make an informed and timely decision about their child's education can amount to a FAPE violation"). In this case, for example, M.M. did not have information on J.S.'s vocational aptitudes and skills, or any current clinical information that she could use to advocate for appropriate social and emotional strategies to help prepare J.S. for his post-school life.

The DOE's failure to involve M.M. in the triennial reevaluation process significantly impeded her opportunity to participate in the decision-making regarding J.S.'s education and violated her principle rights under the IDEA.

### iv.     The DOE's Failure to Reevaluate J.S. Significantly Impeded his Right to a FAPE

The DOE's failure to engage in the triennial reevaluation process for J.S. prior to the 2012-2013 school year significantly impeded J.S.'s right to a FAPE.

The IDEA required an "IEP team" to review the existing information on J.S. and on the "basis of that review, and input from the child's parents, identify what additional data, if any, are needed." 34 C.F.R. § 300.305(a)(2). However, the DOE presented no evidence that any IEP team was formed to determine if any additional information about J.S. was needed prior to the May 22, 2012 CSE meeting. As noted above, the DOE did not engage M.M. in any discussions about

18

developing additional data on J.S. In fact, the affidavit from CSE representative Ms. Alvarez reveals her mistaken belief that the DOE did not need to engage in the triennial reevaluation process because the "results of the 2009 psycho-educational were still valid" (Exh. 22 ¶ 16).

Moreover, the DOE's failure to engage in the triennial reevaluation process was clearly an impediment to the provision of a FAPE to J.S. given the central importance of evaluations under the IDEA. *See Bell*, 2008 WL 5991062, at *31; S. Rep. 108-185; *see also N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1210 (9th Cir. 2008) (without adequate evaluative information, "it was not possible for the IEP team to develop a plan reasonably calculated to provide [the student] with a meaningful educational benefit"); *Cf. R.E.*, 694 F.3d at 190 (finding that the failure to conduct an adequate functional behavioral assessment "seriously impairs substantive review of the IEP because courts cannot determine exactly what information an FBA would have yielded and whether that information would be consistent with the student's IEP").

Thus, the DOE's failure to reevaluate J.S. prevented the CSE from developing a complete picture of J.S.'s impairments and impeded his right to a FAPE.

### v.    The DOE's Failure to Reevaluate J.S Deprived Him of Educational Benefits

The DOE's failure to reevaluate J.S. resulted in an IEP that failed to properly reflect J.S.'s vocational and academic needs, depriving him of educational benefits.

While J.S. was age 18 at the time of the May 22, 2012 meeting, the CSE did not develop a vocational or any other transition assessment necessary to make recommendations for J.S.'s transition to post-school activities. This was contrary to the IDEA's requirement that "beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter," an IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate,

19

independent living skills." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa); *see also* 8 N.Y.C.R.R. § 200.4(b)(6)(viii) (school districts must ensure that students who have reached age 12 "receive an assessment that includes a review of school records and teacher assessments, and parent and student interviews to determine vocational skills, aptitudes and interests").

The DOE presented no evidence that it had ever conducted a vocational assessment of J.S. (*see* Exhs. 1-25; Tr. 6-16, 54-109), and there is no support in the record for the SRO's determination that "the May 2012 CSE reviewed adequate postsecondary and vocational related information and developed a comprehensive transition plan" (SRO Dec. No. 14-018 at 12). To the contrary, the DOE's failure to develop any vocational information on J.S. resulted in an IEP that failed to contain any specific plan for J.S. to develop vocational skills (*see* Exh. 3). The IEP's long term employment goal for J.S. was: "[a]fter graduation from high school, [J.S.] will gain experience in a part-time job related to the career of his choice" (Exh. 3 at 3). The IEP's recommended "coordinated set of transition activities" was just as void of detail with respect to vocational training (Exh. 3 at 10-11): J.S. was to "participa[te] in small group vocational activities" and "participa[te] in a work study program to develop job work skills" (Exh. 3 at 11). The "Functional Vocational Assessment" box in the IEP's ""Coordinated Set of Transitional Activities" section was left blank (Exh. 3 at 11). In this case, where J.S. was to be placed at a job site all day at McSweeney, the DOE's failure to preform a vocational assessment is egregious and clearly deprived him of educational benefits (Exh. N ¶ 9; Exh. X ¶ 12; Tr. 11, 13-14).

Furthermore, the DOE's failure to develop evaluative information on J.S. resulted in an IEP that recommended an inappropriate 12:1:1 program. The SRO does not cite to any evidence in the record that indicates that a DOE 12:1:1 program was appropriate (SRO Dec. No. 14-018 at 14-15). Rather, to find that the 12:1:1 program did not deny J.S. a FAPE the SRO improperly

shifted the burden of proof onto M.M. writing that "the hearing record does not contain sufficient evidence upon which to conclude that the recommendation was not appropriate to meet the student's needs or that the recommended placement could not provide the student with a small, structured setting or appropriate opportunities for individualized support in a special education environment" (SRO Dec. No. 14-018 at 15). This logic violated New York State law, which places the burden on the local school district to prove that it provided a child with a FAPE. N.Y. Educ. L. § 4404(1)(c). The SRO's failure to adhere to New York State law in this instance is indicative of both the lack of evidence in the record supporting the 12:1:1 program recommendation and of the SRO's inadequate reasoning throughout the decision. *See Reyes v. New York City Dep't of Educ.*, No. 13-158, 2014 WL 3685943 at *6 n.5 (2d Cir. July 25, 2014) (noting that where the SRO improperly shifted the burden of proof and required a parent to prove an IEP was inadequate, "the SRO's failure to adhere to state law decreases our confidence in the thoroughness of his decision").

Moreover, the fact that the SRO was unable to point to any evidence indicating that the IEP's program recommendation was appropriate, and resorted to improperly shifting the *Burlington* Prong I burden onto M.M., implicitly acknowledges that the record lacks the evaluative information to indicate that a DOE 12:1:1 program was appropriate for J.S. In fact, as demonstrated below, the most substantiate evidence in the record reveals that a DOE 12:1:1 program was inappropriate for J.S.

Thus, the DOE's failure to engage in the triennial reevaluation process deprived J.S. of educational benefits.

**B.  The Failure of J.S.'s IEP to Indicate the Academic and Vocational Nature of the Recommended Program Significantly Impeded M.M.'s Ability to Participate in the Decision-Making Process Regarding J.S.'s Education and Deprived J.S. of an Appropriate IEP**

The SRO dismissed M.M.'s contention that the IEP was deficiently vague in failing to indicate the academic and vocational nature of J.S.'s recommended program (SRO Dec. No. 14-018 at 15-16; *see* Jan. 23, 2014 Verified Petition ¶¶ 41-42). The SRO reasoned that while the IEP "did not specifically break down" the amount of academic and vocational instruction J.S. would receive," the testimony from the McSweeney IEP coordinator Ms. Naclerio that "nothing in the student's May 2012 IEP precluded his participation in either a part-time or full-time vocational work placement" cured this deficiency (SRO Dec. No. 14-018 at 15-16). The SRO's reasoning is wrong and based on impermissible retrospective testimony.

The IEP's failure to define the nature of J.S.'s course of study prevented M.M. from making an informed decision about J.S.'s education, denying J.S. a FAPE. 20 U.S.C. § 1415(f)(3)(E)(ii)(II) (a procedural inadequacy may result in a denial of a FAPE if it "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child). A child's IEP must amply articulate the recommended program so that a parent has "sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision." *R.E.*, 694 F.3d at 186; *see also T.K. v. New York City Dep't of Educ.*, No. 10-CV-0752, 2014 WL 3687244 at *14 (E.D.N.Y. July 23, 2014) (holding that abstract language in an IEP precludes parental participation and that "[t]he substance of the IEP must be intellectually accessible to parents").

The IDEA requires a school district to provide written notice whenever it proposes "to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child." 34 C.F.R. § 300.503(a)(1). In this case, the DOE failed to

provide M.M. with any written notice that it was proposing to place J.S. in a full-day work

program. M.M. did not learn of this program change until she visited McSweeney on June 20,

2012 (Exh. X ¶¶ 11-12). Indeed, CSE representative Ms. Alvarez testified that the "school the

child was placed in would" inform M.M. how much of J.S.'s time would be spent in a vocational

versus an academic program (Tr. 59-60). She stated "once the child's at school, you know, then

the parent would know what's going on" (Tr. 60).

Beyond the plain language of the IDEA implementing regulations, cited above, recent

guidance from the U.S. Department of Education emphasizes that a school district must provide

prior written notice to a parent when placing her child at a work site or changing the child's work

placement:

> If a public agency is proposing or refusing to initiate or change a work placement
> that is part of a child's transition services, the public agency would be required to
> provide the parent with written notice . . . a reasonable time before the proposed
> placement is initiated or changed. Therefore, initiating or changing a child's work
> placement that is part of the child's IEP would require prior written notice as
> outlined in 34 C.F.R. § 300.503.

*See* Letter from Musgrove to Spitzer-Resnick et al. at 2 (*available at*

www2.ed.gov/policy/speced/guid/idea/memosdcltrs/062212workplacelre2q2012.pdf) (last

visited Aug. 12, 2014).[2]

The guidance from the U.S. Department of Education goes on to explain that "[i]f an IEP

Team determines that work placement is an appropriate transition service for a child, it must be

included in the child's IEP." Letter from Musgrove to Spitzer-Resnick et al. at 2. In this case,

J.S.'s IEP contains no specific information about his work placement (*see* Exh. 3).

Additionally, as demonstrated above, the DOE's failure to perform the required

vocational evaluation resulted in an IEP that contains only generic goals and services related his

---

[2] This letter is also attached to M.M.'s Jan. 23, 2014 Verified Petition.

post-school life (*see* Exh. 3 at 3, 10-11). For example, the IEP noted that "[a]fter graduation, [J.S.] will gain experience in a part-time job related to the career of his choice" (Exh. 3 at 3). This ambiguity violated the IDEA's requirement that, "beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter," a child's IEP must include:

> (aa) appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills; [and]
>
> (bb) transition services (including course of study) needed to assist the child in reaching those goals

20 U.S.C. § 1414(d)(1)(A)(i)(VIII); *see* 34 CFR § 300.320(b).

Guidance from the New York State Education Department indicates that the deficiently vague vocational recommendations in J.S.'s IEP violated the IDEA and New York State law. *See* Memorandum Cort to District Superintendents et al., at 2 (Nov. 2011) (stating that an IEP must set forth "the student's <u>needs</u> as they relate to transition from school to post-school activities, including the courses of study to be provided to the student to reach those goals") (emphasis in original) (*available at* www.p12.nysed.gov/specialed/publications/transitionplanning-nov11.pdf) (last visited Aug. 12, 2014).[3]

Furthermore, in failing to describe the nature of J.S.'s educational program in the IEP, informing M.M. that J.S. would be in a primarily vocational program at her June 2012 visit to McSweeney, and then presenting testimony at the May 2013 hearing that McSweeney could meet whatever needs J.S.'s had (*see* Exh. 21 ¶¶ 20-21; Tr. 11-14), the DOE's conduct in this case is similar to the "bait and switch" conduct described in *D.S. v. New York City Department of Education. See D.S. v. New York City Dep't of Educ.*, No 13-CV-3476, 2014 WL 2600313, at ** 1, 4) (E.D.N.Y. June 10, 2014) (finding the DOE violated a "parent's right to meaningfully

---

[3] This memorandum is also attached to M.M.'s Jan. 23, 2014 Verified Petition.

participate in the school selection process . . . when the DOE directed her to inspect a school her

child would not attend"); *see also M.H. v. New York City Dep't of Educ.*, 712 F.Supp.2d 125,

167 (S.D.N.Y. 2010) (finding that the DOE "was less than forthcoming about the nature of [the

student's] recommended placement" where the DOE informed the parent that her child would be

placed one classroom and then after a due process complaint was filed identified another

classroom as the child's placement), *aff'd*, 685 F.3d 217 (2d Cir. 2012).

  Thus, the DOE's failure to specify the nature of J.S.'s educational program prevented

M.M. from participating in the decision-making process regarding J.S.'s education.

  In assessing M.M.'s claim that J.S.'s IEP was deficiently vague, the SRO first cited to the

testimony of CSE representative Ms. Alvarez, which he wrote "identified the vocational skills

the student would learn" (SRO Dec. No. 14-018 at 15, citing Tr. 60). However, the cited

testimony is simply Ms. Alvarez's statement that "the IEP, it's – you know, it's telling you what

they could cover, what vocational skills would be covered," (Tr. 60). This testimony does not

actually identify any vocational skills J.S. would learn, nor does J.S.'s IEP (*see* Exh. 3).

  The SRO then cites to testimony from McSweeney IEP coordinator Ms. Naclerio that he

concludes indicates that "the assigned public school site could have [] implemented the academic

and vocational components of the student's May 2012 IEP in such a way as to provide the

student with an adequate balance of academic programs and vocational programs" (SRO Dec.

No. 14-018 at 16). However, Ms. Naclerio's impartial hearing testimony that J.S. could have

been placed in a program at McSweeney that was either a part-time or a full-time vocational

program (Tr. 11, 13-14), confirms that J.S.'s IEP was impermissibly vague and prevented M.M.

from knowing the type of program that was being recommended for J.S.

Moreover, Ms. Naclerio's testimony is exactly the type of retrospective testimony that the Circuit warned against in *R.E.* that could potentially allow a district to attempt to correct an otherwise defective program. *See R.E.*, 694 F.3d at 186 ("[u]nder the [DOE's] view, a school district could create an IEP that was materially defective, causing the parents to justifiably effect a private placement, and then defeat the parents' reimbursement claim at a *Burlington/Carter* hearing with evidence that effectively amends or fixes the IEP by showing that the child would, in practice, have received the missing services. The [DOE's] view is incorrect"). In fact, in this case, while Ms. Naclerio's testimony does not cure the IEP's deficiencies, the SRO nevertheless relied on her testimony to ignore the facts that 1) IEP did not indicate the amount of academic versus vocational instruction in the recommended program (*see* Exh. 3); and 2) that the DOE informed M.M. upon her visit McSweeney prior to the start of the 2012-2013 school year that J.S. would spend his entire school day at a worksite (Exh. N ¶ 9; Exh. X ¶¶ 11-12).

Furthermore, the record reveals that J.S. still needed a robust academic program, which the deficiently vague IEP failed to recommend. J.S.'s 2011-2012 Cooke progress report, which was presented at the CSE meeting, demonstrated that J.S. continued to be interested in his academic classes and was learning and making progress across subjects (*see* Exh. 4). At the CSE meeting, Ms. Ord explicitly stated that "[i]t would not be appropriate for [J.S.] to be in a vocational" program (Exh. 11 at 4; *see also* Exh. 12 at 4 (Ms. Ord noted at the CSE meeting that a program with a "strong vocational focus" was not appropriate for J.S)).

In summary, the DOE's failure to specify the nature of J.S.'s educational program prevented M.M. from participating in the decision-making process regarding J.S.'s education and denied J.S. educational benefits; and the SRO relied on impermissible retrospective evidence to defeat M.M.'s claim that the DOE's program recommendation denied J.S. a FAPE.

**C.  The 12:1:1 Program Recommendation Deprived J.S. of Educational Benefits**

The DOE's procedural failure to develop evaluative information on J.S. resulted in an IEP that recommended a substantively inappropriate 12:1:1 program.

The most definitive evidence in the record reveals that a DOE 12:1:1 program was inappropriate for J.S., as the Cooke educators who taught J.S., and were personally familiar with his impairments, testified that a such program was inadequate. Ms. Ord stated that J.S. "needs a small student-to-teacher ratio, smaller than 12:1+1" and that he required "one-to-one and small group instruction because he needs repetition and individualized support" (Exh. M ¶ 18). Ms. Hibbard, J.S.'s literacy and math teacher, stated that J.S. needed "frequent check-ins and regular teacher prompting to ensure that he is committing new information to long-term memory" (Exh. I ¶ 7). He needed a small setting so that a teacher could give immediate and explicit feedback about what he was learning and about his social behavior (Exh. I ¶¶ 8, 11). J.S. needed "a teacher to sit right next to him and walk him through new material repeatedly in a variety of different settings and at a variety of different times and days" (Exh. I ¶ 12; *see* Exh. I ¶ 17).

In short, the most substantiated evidence in the record indicates that the IEP's 12:1:1 program recommendation would not have allowed J.S. to make progress.

**D.  The SRO's Preclusion of M.M.'s Allegation that McSweeney Could Not Have Provided J.S. with a FAPE is Wrong**

The SRO determined that M.M.'s allegation that McSweeney could not implement J.S.'s IEP was speculative and "it would be inequitable to allow the parents to challenge the May 2012 IEP through information they acquired" after the May 22, 2012 CSE meeting (SRO Dec. No. 14-018 at 19-22; *see also* SRO Dec. 13-157 at n.12). The SRO's determination is wrong.

The May 22, 2012 IEP failed to indicate whether J.S. would be placed in program that continued to emphasize building academic skills. It was not until M.M. visited McSweeney on

27

June 20, 2012 that she learned that J.S. would be placed at a work site all day and would receive only limited academic instruction (Exh. N ¶ 9; Exh. X ¶ 11-12). This information about the fundamental nature of J.S.'s educational program was not contained in the IEP (*see* Exh. 3). Likewise, at the impartial hearing CSE representative Ms. Alvarez testified that the "school the child was placed in would" inform M.M. of the time J.S. would spend in vocational versus an academic instruction (Tr. 59-60). Ms. Alvarez stated "once the child's at school, you know, then the parent would know what's going on" (Tr. 60). Thus, the DOE's specific program recommendation for J.S. was not revealed to M.M. until she visited McSweeney.

The SRO's determination that M.M.'s allegations regarding McSweeney were speculative 1) allowed the DOE withhold the specifics of J.S.'s educational program from M.M. by writing a vague IEP, and 2) insulated the DOE from its responsibility to cure deficiencies in J.S.'s program once M.M. learned of the program's specifics. In fact, M.M. asked the DOE for an appropriate IEP and placement after her visit to McSweeney, which the DOE had at least until the start of the J.S.'s school year on July 2, 2012 to provide (Exh. B). *See* 20 U.S.C. § 1414(d)(2)(A) ("[a]t the *beginning of each school year*, each local educational agency … shall have in effect for each child with a disability in the agency's jurisdiction, an individual education program") (emphasis added); *see also M.P.G. v. New York City Dep't of Educ.*, No. 08-CV-8051(TPG), 2010 WL 3398256, at *9 (S.D.N.Y. Aug. 27, 2010) (holding that "an education department's delay" in providing a placement school for a child "does not violate the IDEA so long as the department still has time to find an appropriate placement for the beginning of the school year"). However, the DOE never responded to M.M.'s June 21, 2012 request for an appropriate program (Exh. B; Exh. C; Exh. 1 at 4). Thus, the SRO's determination that M.M.'s

allegations regarding McSweeney were impermissibly speculative punishes her for continuing to communicate with the DOE to allow it to offer J.S. an appropriate program.

Additionally, for the SRO to rule that the DOE provided J.S. a FAPE because McSweeney could have appropriately "implemented the academic and vocational components in the student's May 2012 IEP" (SRO Dec. No. 14-018 at 16) and then turn around and hold that M.M. "cannot prevail on claims that the district would have failed to implement the May 2012 IEP at the assigned school site because a retrospective analysis is not an appropriate inquiry under the circumstances of this case" SRO Dec. No. 14-018 at 21) demonstrates the strained logic the SRO used to rule against M.M.'s claim.

Moreover, the SRO's position that the issue of the provision of a FAPE concerns only a student's IEP, and not the particular school site offered to implement that IEP is wrong. The Second Circuit has rejected the SRO's position that information concerning the placement school is "speculative" in cases, such as this one, where there is a specific allegation that the proposed placement school could not provide a child with a FAPE. *See Reyes*, 2014 WL 3685943, at *6 (where the placement "was incapable of addressing [the child's] sensory needs, and that the [placement school's] methodology was inappropriate" for the child the "DOE has failed to prove that its proposed IEP provided [the child] with a FAPE"); *T.Y.*, 584 F.3d at 420 (school districts do not have "carte blanche to assign a child to a school that cannot satisfy the IEP's requirements"); *R.E.*, 694 F.3d at 191-192 (the DOE "may select the specific school site without the advice of the parents so long as it conforms to the program offered in the IEP").

District courts also reject the SRO's position. *See C.U.*, 2014 WL 2207997, at *14 ("[b]ecause the procedural protections in the IDEA are intended to ensure substantive outcomes . . . it follows that parents have a procedural right to evaluate the school assignment, i.e., the right

to acquire relevant and timely information as to the proposed school") (internal citations

omitted). *Scott v. New York City Dep't of Educ.*, No. 12-CV-3558(AT), 2014 WL 1225529, at

*19 (S.D.N.Y. Mar. 25, 2014) ("[t]he proper inquiry for the Court . . . is whether the alleged

defects of the placement were reasonably apparent to Plaintiff or the DOE when Plaintiff rejected

[the placement school]. The record supports the inference that the alleged defects were

reasonably apparent to both parties at that time. . . . Under the circumstances of this case, the

Court holds that Plaintiff's claim that [the child's] placement class was substantively

inappropriate is sufficiently prospective"); *E.A.M. v. New York City Dep't of Educ.*, No. 11-CV-

3730(LAP), 2012 WL 4571794, at *11 (S.D.N.Y. Sept. 29, 2012) ("a parent may challenge the

adequacy of a placement classroom – even if the child never enrolled in the school – if the

alleged defects were reasonably apparent to either the parent or the school district when the

parent rejected the placement" (citing *T.Y.*); *D.C. v. New York City Dep't of Educ.*, No. 12-CV-

1394(JGK), 2013 WL 1234864, at *16 (S.D.N.Y. Mar. 26, 2013) ("[t]he proposed placement

was inappropriate under the IDEA and constituted the denial of a FAPE"); *B.R. v. New York City

Dep't of Educ.*, 910 F.Supp.2d 670, 679 (S.D.N.Y. 2012) ("the Court finds that the proposed

placement as shown to [the parent] in June 2010 was substantively inappropriate under the IDEA

and constituted a denial of a [FAPE]"); *J.F. v. New York City Dep't of Educ.*, No. 12-CV-

2184(KBF), 2012 WL 5984915, at *10 (S.D.N.Y. Nov. 27, 2012) (remanding to an IHO for a

determination as to the adequacy of a student's "proposed classroom placement"), *motion for

reconsideration denied*, 2013 WL 1803983 (S.D.N.Y. Apr. 24, 2013); *D.S.*, 2014 WL 2600313,

at *4 ("the characteristics of the specific school site can be an important factor in assessing the

adequacy of the IEP and its implementation"); *T.L. v. New York City Dep't of Educ.*, No. 12-CV-

4483, 2013 WL 1497306, at *13 (E.D.N.Y. Apr. 12, 2013) (remanding to the SRO for a

determination regarding how the DOE's recommended school placement "could and would have addressed [the student's] disabilities").

In fact, in this case, not only did the evidence show that J.S.'s deficiently vague IEP resulted in McSweeney offering J.S. an inappropriate program placing him at a work site all day (*see* Exh. N ¶ 9; Exh. X ¶ 12), but the DOE also failed to prove that McSweeney could meet the requirements of J.S.'s IEP as written. For example, contrary to the IEP's recommendations, Ms. Naclerio testified that bank visits were not part of McSweeney's curriculum (Tr. 12; *see* Exh. 3 at 3-4). Ms. Naclerio could not offer any assurance that J.S. would be admitted to McSweeney's travel training program (Exh. 21 ¶ 27; *see* Exh. 3 at 8-9). McSweeney only provided academic instruction that was below J.S.'s grade level (Exh. N ¶¶ 13-14; *see* Exh. 3 at 1, 12), and the school lacked a program for teaching social skills (Exh. N ¶ 17; *see* Exh. 3 at 7-8). Thus, McSweeney's program did not comply with J.S.'s IEP.

In summary, the SRO's determination that M.M.'s allegations involving McSweeney were speculative is errant and inequitable to M.M.'s efforts to ensure that her child was provided an appropriate education.

### POINT II: COOKE WAS AN APPROPRIATE PLACEMENT FOR J.S.

M.M. satisfied her burden at *Burlington* Prong II, showing that Cooke was an appropriate placement for J.S.

Under *Burlington* Prong II, a private school is appropriate if it provides services that are "proper under the Act," *Carter*, 510 U.S. at 15; *Burlington*, 471 U.S. at 370, *i.e.*, the services are "'likely to produce progress, not regression,'" *Gagliardo*, 489 F.3d at 112 (quoting *Walczak*, 142 F.3d at 130). Parents must show that the "placement provides 'educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are

necessary to permit the child to benefit from instruction.'" *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir. 2006) (quoting *Rowley*, 458 U.S. at 188–89).

In this case, Cooke's summer 2012 program was appropriately designed to help J.S. maintain the skills he had learned during the prior academic year (Exh. K ¶ 17). The academic environment was small and individualized, with two teachers for the 12-student, functionally grouped academic classes (Exh. K ¶¶ 8-9, 11-12). During the summer, J.S. participated in an internship and community activities; he received speech and language therapy, as well as counseling (Exh. K ¶¶ 13, 16, 18, 21-22, 24).

Cooke's academic year program for 2012-2013, SKILLs, was also appropriate for J.S. Cooke's SKILLS program was tailored to meet the transition needs of students such as J.S. (Exh. J ¶ 5; Tr. 163). It was designed to teach students to be as independent as possible, serving the whole child by integrating related services with academic and emotional support (Exh. J ¶ 5). SKILLS provided a small environment as it contained only 34 students (Exh. J ¶ 6). J.S.'s math and literacy classes had one teacher and five students (Exh. I ¶¶8-9; Exh. J ¶ 9). He took a class to learn adaptive skills, which was taught by an occupational therapist (Exh. J ¶ 8; Exh. 19 at 1, 15-16). J.S. took a vocational skills class and had an internship (Exh. J ¶ 8; Exh. 19 at 1, 9-10). J.S. had individualized support at his internship, where he practiced skills such as self-control, problem solving, and appropriate body language (Exh. J ¶¶ 12-17). Cooke provided J.S. with travel training, and three afternoons a week he went out into the community to banks, museums, and libraries (Exh. J ¶¶ 19-20). Cooke's program also included individual and group counseling, speech and language therapy, as well a current events class (Exh. J ¶¶ 8, 21-24).

J.S. made meaningful progress during the 2012-2013 school year. For instance, in literacy class, J.S. was beginning to identify character motivation and emotion (Exh. I ¶ 15). He was

rereading his written work, and editing for punctuation and grammar; he was typing with two hands and he was nearly able to send an email without prompting (Exh. I ¶ 15). In math, J.S. was now able to calculate change mostly in his head (Exh. I ¶ 18). With support, J.S. was going out into the community and using banks and libraries, and shopping at grocery stores (Exh. I ¶¶ 18-19; Exh. J ¶ 25). Socially and emotionally, J.S. had an increased sense of self-awareness and purpose; he had an increasing ability to advocate for his needs; and his use of tone and language were improving (Exh. I ¶ 20; Exh. J ¶ 27). At his internship, J.S. was now able to complete all tasks and observe proper safety precautions without direct prompting (Exh. J ¶ 26).

In short, Cooke was an appropriate placement for J.S.

### POINT III: THE EQUITIES FAVOR TUITION PAYMENT

Equitable considerations bear on the appropriate relief to be awarded under the IDEA, *Burlington*, 471 U.S. at 374, and "'include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters.'" *Wolfe v. Taconic-Hills Cent. School Dist.*, 167 F.Supp.2d 530, 534 (N.D.N.Y. 2001) (quoting *Burlington v. Dep't of Educ.*, 736 F.2d 773, 801-02 (1st Cir. 1984)).

M.M. participated in the May 22, 2012 CSE meeting, stating that she was most interested in J.S.'s academic progress (Exh. X ¶ 8). After receiving the placement notice, M.M. toured McSweeney, learning that the students in the program spent most of their time at job sites, which was inappropriate for J.S. as he needed to learn academic and life skills and become more independent (Exh. X ¶¶ 10-12). On June 21, 2012, M.M. notified the DOE of her concerns and asked for another program and placement (Exh. B). On August 22, 2012, M.M. again informed the DOE that McSweeney was inappropriate and requested another placement (Exh. C).

M.M. signed the contracts to enroll J.S. at Cooke for the summer and academic year

programs on June 25, 2012 (Exhs. D, E). Notably, clauses in these contracts released M.M. if, prior to July 30, 2012, she chose to enroll J.S. in a DOE summer program or if, prior to October 31, 2012, she chose to accept a DOE academic year placement (Exh. D ¶ 7.b, Exh. E ¶ 10.b).

The record establishes that M.M. cooperated with the DOE and did not impede the DOE's ability to offer J.S. a FAPE. As such, the equities favor an award of tuition payment. *Cf. N.R. v. New York City Dep't of Educ.*, 07-CV-9648 (BSJ), 2009 WL 874061, at *6 (S.D.N.Y. Mar. 31, 2009) (finding in favor of a parent on *Burlington* Prong III where record was "bereft of any evidence that [a parent] hindered [the DOE's] efforts to provide a FAPE or otherwise frustrated the placement process"); *see also M.M. v. New York City Dep't of Educ.*, No. 11-CV-3517(AKH), 2014 WL 2757042, at *8 (S.D.N.Y. June 27, 2014) (where there was no evidence that a parent had been uncooperative in the process of developing an IEP "the DOE ha[d] not met its burden of showing that the equities do not favor reimbursement").

The equities support M.M.'s claim for tuition funding.

## POINT IV: DIRECT PAYMENT OF TUITION IS APPROPRIATE

The Court should order the DOE to pay J.S.'s 2012-2013 12-month tuition directly to Cooke. *See E.M.*, 2014 WL 3377162, at *8 (holding that "the broad spectrum of equitable relief contemplated under the IDEA encompasses, in appropriate circumstances, a 'direct-payment' remedy" and that a direct payment remedy "furthers the IDEA's remedial purposes by extending the unilateral withdrawal option to parents with limited financial means, who otherwise could not avail themselves of it"); *see also Mr. and Mrs. A.*, 769 F.Supp.2d at 406 (holding that the IDEA authorizes an award of retroactive tuition payment directly to a private school where the three *Burlington* prongs have been satisfied and "the parents, due to a lack of financial resources, have not made tuition payments but are legally obligated to do so"). The terms of the Cooke

enrollment contracts unambiguously create a binding obligation on the part of M.M. to pay J.S.'s tuition for the 2012–2013 school year in an amount totaling $55,775.00 (Exhs. D, E).

Moreover, here, as in *Mr. and Mrs. A.*, the parent "lack[s] the financial resources to 'front' the costs of private school tuition," and the school was "willing to enroll the student and take the risk that the parent[] will not be able to pay tuition costs – or will take years to do so." *Mr. and Mrs. A.*, 769 F.Supp.2d at 428. M.M. presented uncontroverted evidence that she lacked the financial resources to front the costs of the Cooke tuition: M.M.'s family income was only around $30,000 in 2012, and M.M.'s family had less than $500 in savings (Exh. X ¶¶ 23, 25; *see* Exhs. F, G (2012 tax returns for M.M. and J.S.'s father)).

Thus, an award of direct tuition payment is appropriate.

## CONCLUSION

For the reasons set forth above, we respectfully request that the Court overturn the SRO's decision and issue an award in favor of M.M.

Dated:  New York, New York
        August 12, 2014

/s/ Thomas Gray
THOMAS GRAY (TG 0880)
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for Plaintiff
271 Madison Avenue, 17th Floor
New York, NY 10016
(212) 683-7999 ext. 246
Fax: (212) 683-5544
tgray@pfcr.org